# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTWINE HALL** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 19-0110** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA LAW** | : | |
| **DEPARTMENT,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                        SEPTEMBER 30, 2020

# MEMORANDUM OPINION

## INTRODUCTION

　　Plaintiff Antwine Hall commenced this civil action against Defendants City of Philadelphia Law Department (the "City") and twenty (20) individual police officers (collectively, the "Individual Defendants") (collectively with the City, "Defendants"), in which he asserted claims under 42 U.S.C. § 1983 for false arrest, false imprisonment, and malicious prosecution, claims under 42 U.S.C. §§ 1981 and 1985 for discrimination and violation of equal protection rights, and various state law claims.  Before this Court is Defendants' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure ("Rule") 56, [ECF 9], which seeks judgment with respect to all claims.  In response to the motion, Plaintiff has withdrawn all of his claims against fourteen (14) of the Individual Defendants,[1] as well as his discrimination, equal protection, and *Monell* claims.  [ECF 12].    These claims are, therefore, deemed withdrawn with prejudice.  Plaintiff opposes Defendants' motion with respect to the remaining federal and state law claims

---

[1]　　Plaintiff has withdrawn all claims against Defendants Geoffrey Strubinger, Michael Corbett, Marc Monachello, Daniel Carr, Brian Derlin, Michael Acerenza, Stephen Gracesk, Gerald Smith, Peter Marino, James Priadka, James Siban, Robert Hassel, Jr., Victor Rodriquez, and George Marko.  As such, Plaintiff's remaining claims include *only* those against Commissioner Richard Ross, Jr. ("Commissioner") and Detectives Craig Coulter, Thad Wolkiewicz, John Druding, Justin Falcone, and Donald Suchinsky (collectively, the "Detective Defendants").

against the remaining defendants (Commissioner Ross and the Detective Defendants) (collectively, the "Remaining Defendants") premised on claims of false arrest, false imprisonment, malicious prosecution, and intentional and negligent infliction of emotional distress. The issues raised by the parties have been fully briefed and are ripe for disposition. For the reasons set forth, Defendants' motion is granted and judgment is entered in favor of the Remaining Defendants on the remaining claims.

## BACKGROUND[2]

In the complaint, Plaintiff alleges that his constitutional rights were violated when Defendants arrested and detained him and prosecuted charges against him without probable cause. Following the completion of discovery, Defendants filed the underlying motion for summary judgment. When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant; here, Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). The relevant facts are summarized as follows:

> On July 28, 2016, at approximately 6:00 p.m., Philadelphia police were alerted to a shooting in progress on the 3100 block of Rosewood Street, Philadelphia, Pennsylvania, by a 911 call made by eyewitness Sabia Afroz, who lived on the block. Ms. Afroz's description of the incident is described in detail below. Though Officers Peter Marino and Gerald Smith were the first officers on the scene, they played a small role in the investigation that followed, as they were the officers who transferred the victim, Milan Chase, to the hospital. Officers

---

[2]    The facts set forth in this opinion are compiled from a review of the parties' statements of undisputed and disputed material facts, briefs, and the evidence submitted therewith. To the extent that the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts. Where the parties have specifically cited exhibits attached to their briefs, the Court has reviewed and considered those cited materials. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006); *see also Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011) (noting that "a court is not obliged to scour the record to find evidence that will support a party's claims.") (citing *Doeblers'*, 442 F.3d at 820 n.8); Fed. R. Civ. P. 56(c)(3) ("The court *need* consider only the cited materials, but it *may* consider other materials in the record.") (emphasis added). To the extent that any facts are disputed, such disputes will be noted and, if material, will be construed in Plaintiff's favor, pursuant to Rule 56.

Daniel Carr and Brian Develin arrived on the scene and assisted in establishing and securing the crime scene.  Officer Carr was approached by a woman, identifying herself as Susan Purnell, the grandmother of Ms. Chase.  Ms. Purnell told Officer Carr that she had observed two black male shooters and identified the men as Richard Holmes and a man named Steve.  After receiving this information, Officer Carr communicated over police radio a brief visual description of the two men Ms. Purnell described.  He later prepared a memo for Detective Craig Coulter (the subsequently-assigned lead investigator) regarding his conduct of securing the scene and receiving information from Ms. Purnell.  Officers Carr and Devlin had no further participation in the investigation.

Around 7:40 p.m., Detectives Coulter, Thaddeus Wolkiewicz, and Justin Falcone arrived at the scene.  Detective Wolkiewicz prepared a written summary based on the detectives' interviews of Ms. Chase (the shooting victim), and two other witnesses on the scene:  Ms. Purnell and Jeffrey Diamond.  Ms. Chase reported that, while walking across North Rosewood Street in the 3100 block, she observed two men arguing.  One of the men fired a gun at the other.  Ms. Chase was struck in the arm by a bullet fired by the shooter.  She stated that she recognized the man who fired the gun as someone who lived on the block and she did not recognize the other man.[3]

Ms. Purnell, who was walking down the street with her granddaughter Ms. Chase, similarly reported that she observed two men arguing in the street.  She recognized one of the men as Richard Holmes, a man who lived on the block, and claimed in her first interview that she did not recognize the other man.  Ms. Purnell observed Mr. Holmes remove a gun from a Jeep and begin firing at the other man.  Her granddaughter was then struck in the arm.  Ms. Purnell also observed another man (one who was not involved in the argument) fire a gun from a second-floor window of 3146 Rosewood Street.  She recognized the man from the window as Stephen Kearney.  Ms. Purnell claimed during this first interview that she did not recognize the other male who was initially arguing with Mr. Holmes.

The second eyewitness, Mr. Diamond, reported that he observed two men arguing in the street.  He did not know either of the men.   He reported that both men pointed guns at each other, exchanged fire, and then fled the scene.  Later that evening, Mr. Diamond was shown two photo arrays.  In the first, he identified Mr. Holmes as one of the shooters.  A few days later, Mr. Diamond was shown a third array which included a photograph of Plaintiff, but Mr. Diamond did not identify any of the men in the array as one of the two shooters he observed.

Later in the evening of July 28, 2016, Detective Coulter interviewed Ms. Chase at the hospital.  Ms. Chase reported that she and her grandmother observed her cousin, Plaintiff, arguing with Mr. Holmes in the street.  Mr. Holmes then pulled out a gun and shot at Plaintiff, missed, and hit Ms. Chase in the arm.  She also

---

[3]     The police report is unclear as to whether some or all of the victim's statement was obtained after she had been transported to the hospital for treatment.

reported that she heard "a lot" of gunshots. When asked whether she saw Plaintiff with a gun, she answered, "No.  By the time I looked up, [Plaintiff] was driving away in his [dark blue] car."

On August 1, 2016, Detective Wolkiewicz interviewed Ms. Purnell for the second time.  Ms. Purnell reported that the second man engaged in the argument with Mr. Holmes was her cousin, Plaintiff, despite not having identified him during her first interview.  She told Detective Wolkiewicz that, prior to the shooting, Plaintiff was arguing outside of her home on the 3100 block of Rosewood with another man named Steve.  She also reported that during the incident, she saw Mr. Holmes open his car and start shooting, and saw Steve hanging out of a window and shooting.  Ms. Purnell reported that she did not observe a gun in Plaintiff's possession, but saw him get into his car and leave the scene.  At this second interview, Ms. Purnell was shown a picture of Plaintiff (with hair on his head) who she identified as Plaintiff.

On August 2, 2016, Detectives Donald Suchinsky and Stephen Grace[4] interviewed Ms. Afroz (the 911 caller) for the first time.  Ms. Afroz reported that, while looking out her first-floor bathroom window, she witnessed two black males shooting at each other.  One of the men ran up Rosewood Street out of her view and the other ran into her yard to take cover.  The man in her yard then moved back out towards Rosewood Street and fired his gun again up Rosewood Street towards the other male.  She described the man who entered her yard as having a muscular build, very dark complexion, trimmed beard, totally bald, between 5'10" and 6'0", thirty-five to forty years old, wearing a white tee shirt with a round neckline, faded blue jean shorts, and black shoes.  She recalled seeing this man fire three times in the direction of the other man.  Ms. Afroz stated that the man in her yard remained within her view while she was on the 911 call and that she observed him for more than two minutes.

At Ms. Afroz's interview, Detectives Suchinsky and Grace conducted what is known as a "double-blind" interview/photo array.  A double-blind interview/photo array is a procedure in which officers interview a witness without knowing beforehand what the case is about or who is depicted in the photo array to be shown. The photo array provided to Ms. Afroz was kept in an envelope and the interviewing officers did not view it before showing it to her.  The photo array consisted of six photos of black males, five of whom had hair on their heads and one of whom was bald.  The photo of the bald man was a photo of Plaintiff. Detective Suchinsky recorded Ms. Afroz's response to each photo.

Each photo in the array was shown to Ms. Afroz twice.  Ms. Afroz responded to each photo as follows:

---

[4]      In the complaint, Detective Grace is incorrectly identified as Detective Stephen Gracesk.

- First photo (black male with a beard and hair)—Ms. Afroz stated after the first showing that "the beard's kind of the same, the neck is not the same." After the second showing she stated, "It's not him."
- Second photo (black male with a beard and hair)—Ms. Afroz stated after the first showing, "this one could be . . . I am 50%." After the second showing, she stated, "It's still 50%."
- Third photo (black male with a beard and hair)—Ms. Afroz stated after the first showing, "It's not him." After the second showing, she stated, "Definitely not him."
- Fourth photo (Plaintiff, a black male, with a beard and bald)—Ms. Afroz stated after the first showing, "It's more like him. I think this is the person. He looks most likely." After the second showing, she stated, "I can't say 100% but I'm pretty sure he's the one I saw from my window."
- Fifth photo (black male with a beard and hair)—Ms. Afroz stated after the first showing, "He is not." After the second showing, she stated, "He's definitely not."
- Sixth photo (black male with a beard and hair)—Ms. Afroz stated after the first showing, "He is not." After the second showing, she stated, "He's definitely not."

Notably, Plaintiff has proffered no evidence with respect to who actually put together the double-blind photo array that was shown to Ms. Afroz. Detectives Suchinsky and Grace submitted their interview notes and the photo array to Detective Coulter.

During her testimony at a suppression hearing before the Honorable Kai Scott of the Court of Common Pleas of Philadelphia, Ms. Afroz described the incident as follows:

> So I have a small garden right in front of my house. Every day in the afternoon in the summer I go to water my plants. I take my daughter with me most of the time. So what happened, the water supply is from downstairs. So every day I have to attach the water into my bathroom, and then through the pipe away from the window. And then I go and water my plants.
>
> So that day I was about to go to my garden, like five, ten minutes. Then my bathroom, the window of my bathroom, I was standing in front of the window just trying to attach the hose. At that time, I heard two sounds of—sounds like shooting. What happened, I looked through the window and I saw what is happening. Yes. I saw one guy. He's holding the pistol. He was like shooting. He was like right near my garden. He was like shooting the other side of Rosewood Street, and I saw him shooting

at least twice.  The whole time I was standing at the window.  And I was so scared, I called 911 right away, because when I go to the garden, I take my phone with me.  And so I called 911.  And I saw the whole incident in front of me.

Ms. Afroz testified that the entire incident took two minutes.  When the 911 operator asked Ms. Afroz to give a description of the shooter, she provided the following:

> So what happened, I saw a guy.  He was wearing a white T-shirt, and like a half – half pants, like faded jeans, half pants.  He was bald.  He had like a short beard.  He was well built, but not very tall.  He was medium height.  As I told you, his neck was like not really long.  It was like wider.  So I saw that guy, and he was not wearing shoes.  Looked like sandal shoes.  He was – this grayish color, small pistol he was holding in his hand, and then he was shooting from that pistol.

On August 5, 2016, at approximately 8:43 p.m., Officers Geoffrey Strubinger and Marc Monachello were on patrol in the area of 2400 West Somerset Street, when they observed a blue 2008 Pontiac Grand Prix parked illegally blocking a crosswalk.  Plaintiff was the only occupant of the car.  The officers ran the plate, which matched that belonging to Plaintiff.  The officers were advised that both the vehicle and the Plaintiff were involved in a prior shooting.  They were also informed that Plaintiff had an active absconder warrant.   The officers arrested Plaintiff in connection with the absconder warrant and took him into custody.  Later that evening, Detectives Coulter and John Druding prepared and served a search warrant on Plaintiff's vehicle.   The search revealed a single bullet strike mark on the rear trunk and 85 grams of marijuana and drug paraphernalia including: four clear sandwich bags containing loose marijuana, ten clear plastic jars containing marijuana, and fourteen small, blue Ziploc bags containing marijuana.  Thereafter, Plaintiff was charged with possession with intent to deliver a controlled substance (a felony) and intentional possession of a controlled substance (a misdemeanor).  Plaintiff was detained on these charges until April 4, 2018, when he entered a negotiated guilty plea to the misdemeanor possession charge

On August 6, 2016, while Plaintiff was in custody as a result of his arrest the previous evening in connection with the absconder warrant, Detective Coulter prepared an arrest report ("PARS report") to support Plaintiff's arrest for his role in the shooting incident of July 28, 2016.  The PARS report contained, *inter alia*, the following information:

- Ms. Chase's description of observing Plaintiff (her cousin) and Mr. Holmes arguing in the street before Mr. Holmes fired a gun at Plaintiff and both men fled the scene, Plaintiff in his blue car;

- Ms. Purnell's description of observing Plaintiff (her cousin) and Mr. Holmes arguing in the street, Mr. Holmes firing a gun from his vehicle at Plaintiff, and Mr. Kearney firing a gun at Plaintiff from the second-floor window of a nearby residence;

- Mr. Diamond's description of his observation of two black men arguing in the street near his car before they both began shooting at each other, and Mr. Diamond's positive identification of one of the two shooters as Mr. Holmes and his inability to identify either Plaintiff or Mr. Kearney;

- Ms. Afroz's description of her observation from her home of a black male firing a gun and then running into her garden, and Ms. Afroz's later identification of Plaintiff as that shooter, from a photo array;

- That Plaintiff was wanted on an absconder warrant; and

- Confirmation that Plaintiff was the registered owner of a blue Pontiac Grand Prix, which, following execution of a search warrant, was found to have a bullet hole in the rear trunk and to contain 85 grams of marijuana and various paraphernalia indicative of an intent to distribute a controlled substance.

Detective Coulter turned the entire investigation file over to the Philadelphia District Attorney's Office ("DAO"), including all witness interviews, photo arrays, crime scene photos, property receipts, search warrants, affidavits of probable cause, handwritten notes, memoranda, diagrams, the investigation worksheet, incident reports, and the PARS report. Thereafter, the DAO decided to present the case to a grand jury to obtain an indictment against Plaintiff. On October 7, 2016,[5] a grand jury returned an indictment against Plaintiff on charges of aggravated assault, attempted murder, possession of a firearm prohibited, firearms not to be carried without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime (the "Gun-related Charges").

Prior to his trial on the Gun-related Charges, Plaintiff moved to suppress Ms. Afroz's out-of-court identification of him on the basis that the double-blind photo array was unduly suggestive. On January 4, 2018, the Honorable Kai Scott denied Plaintiff's motion to suppress, finding that Ms. Afroz's out-of-court identification was not unduly suggestive.

On March 26, 2018, a jury acquitted Plaintiff of all Gun-related Charges. Nine days later, on April 4, 2018, Plaintiff pled guilty to possession of a controlled substance, the distribution count was *nolle prossed*, and Plaintiff was sentenced to 3-6 months of incarceration and was immediately paroled.

---

[5]     Both parties reference the grand jury's return of the indictment as having occurred on October 7, 2016. The actual indictment was signed by the grand jury foreperson on September 26, 2016 and approved by the supervising judge on October 3, 2016.

**LEGAL STANDARD**

Rule 56 governs summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, Rule 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id*. at 322. After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Rule 56(c)(1)(A)-(B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. of Newark v.*

*DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (citations omitted).

## DISCUSSION

In their motion for summary judgment, Defendants argue that Plaintiff's § 1983 claims for false arrest, false imprisonment, and malicious prosecution fail because, *inter alia*, the undisputed evidence of record demonstrates the existence of probable cause to arrest, detain, and prosecute Plaintiff, which necessarily defeats Plaintiff's claims. This Court agrees.

Section 1983 offers private citizens a means to redress violations of federal law by state officials. *See* 42 U.S.C. §1983. Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a § 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)). Thus, to establish a § 1983 violation, Plaintiff must present evidence sufficient to show that each Defendant acted under color of law and deprived Plaintiff of a right secured by the United States Constitution and/or laws of the United States. *See Robb v. City of Phila.*, 733 F.2d 286, 290-91 (3d Cir. 1984).

### *§ 1983 Claims for False Arrest and False Imprisonment*

Plaintiff's § 1983 claims against the Remaining Defendants are based on his contention that he was subject to a false arrest and false imprisonment in violation of his Fourth Amendment rights under the Constitution. The Fourth Amendment protects against unreasonable seizures of the person. *See* U.S. Const. amend. IV. The Fourth Amendment is applicable to the States through

9

the Fourteenth Amendment. *Baker v. McCollan*, 443 U.S. 137, 142 (1979). The proper inquiry in a § 1983 claim based on false arrest and/or false imprisonment is whether the arresting officer(s) had probable cause to make the arrest. *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)); *see also Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268-69 (3d Cir. 2000); *Johnson v. Provenzano*, 646 F. App'x 279, 281 (3d Cir. 2016).

Probable cause to arrest an individual requires "proof of facts and circumstances that would convince a reasonable, honest" officer that the person arrested has committed a crime. *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993); *see also Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005). Thus, "the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime," but instead on whether the police had probable cause to believe that the individual committed any crime at the time of the arrest. *Wright,* 409 F.3d at 602; *Groman*, 47 F.3d at 634; *see also Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released."). It is also not relevant to the probable cause analysis with what crime(s) a plaintiff was eventually charged. *Wright,* 409 F.3d at 602 (citing *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)).

"Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed." *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992). Courts must objectively assess whether, at the time of the arrest and based upon the facts known to the officer, probable cause existed "***as to any offense that could be charged*** under the circumstances." *Wright*, 409

F.3d at 602 (3d Cir. 2005) (quoting *Barna*, 42 F.3d at 819) (emphasis added); *see also Butler v. City of Philadelphia*, 614 F. App'x 69, 71 (3d Cir. 2015) (quoting *Barna,* 42 F.3d at 819 and citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  In other words, courts must determine "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964); *see also Devenpeck*, 543 U.S. at 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *Barna*, 42 F.3d at 819 (stating "[t]he test for an arrest without probable cause is an objective one, based on 'the facts available to the officers at the moment of arrest.'") (citations omitted).  As long as the arresting officers "had some reasonable basis to believe" that the individual had committed a crime, "the arrest is justified as being based on probable cause." *Barna*, 42 F.3d at 819.  In making this determination, courts must consider the totality of the circumstances known to the officer at the time of the arrest.  *Andrews v. Scuilli*, 853 F.3d 690, 698, 704 (3d Cir. 2017).

Generally, the question of whether probable cause existed for a police officer to support an arrest is a fact question for the jury.  *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).  However, resolution of the issue is appropriate at the summary judgment stage when a court concludes "that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Id.*

Here, Plaintiff bases his § 1983 claims for false arrest and false imprisonment on his August 5, 2016 arrest.  As set forth above, and nowhere disputed by Plaintiff, he was arrested by Officers Strubinger and Monachello in connection with an outstanding absconder warrant that the arresting

officers learned about after running a check on Plaintiff's vehicle's license plate following a traffic stop that Plaintiff does not challenge. After Plaintiff's arrest pursuant to the absconder warrant, police obtained a warrant to search Plaintiff's car; Plaintiff also does not challenge the validity or constitutionality of this search warrant or the subsequent search of his car. The search of Plaintiff's car, conducted by Detectives Coulter and Druding at approximately 11:30 p.m. on August 5, 2016, resulted in the discovery of 85 grams of marijuana and drug paraphernalia which are consistent with an intent to distribute, as well as a bullet hole in the rear of Plaintiff's vehicle.

Sometime the next day (August 6, 2016), Detective Coulter prepared a PARS report for the arrest of Plaintiff (who was already in custody in connection with the absconder warrant) for his role in the non-fatal shooting that occurred on July 28, 2016. This PARS report included, *inter alia*, a summary of the interviews of Ms. Chase, Ms. Purnell, and Mr. Diamond, Ms. Afroz's challenged identification of Plaintiff, and a description of Plaintiff's initial detention pursuant to the absconder warrant and the subsequent discovery of drugs and drug paraphernalia in Plaintiff's car.

As set forth above, it is well-settled that an arresting officer need only probable cause to support "any offense that could be charged under the circumstances" and it does not matter what crime or crimes with which a plaintiff was actually charged. *See Wright*, 409 F.3d 602. Here, Plaintiff does not challenge, nor could he, the existence of probable cause to arrest and detain him pursuant to the absconder warrant or, following the lawful search of his vehicle, for two drug-related charges. Notably, Plaintiff was not only charged with and detained for the drug-related offenses, but actually remained detained on these charges until he pled guilty to one of them on April 4, 2018, a few days after he was acquitted on the Gun-related Charges. Under these facts and circumstances, it cannot be argued that any of the arresting officers lacked probable cause to

arrest and detain Plaintiff on August 5-6, 2016.  Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's § 1983 claims for false arrest and false imprisonment against all Remaining Defendants.

Notwithstanding the clear and unchallenged existence of probable cause to arrest Plaintiff pursuant to the absconder warrant and drug charges, Plaintiff argues that Defendants lacked probable cause to arrest him for the Gun-related Charges because (1) the eyewitness identification on which Defendants relied was unduly suggestive and unreliable in light of other exculpatory evidence, including the fact that another eyewitness (Mr. Diamond) was unable to positively identify either suspect from a photo array that included Plaintiff's picture, and (2) the forensics report showed the bullet casings found in Ms. Afroz's yard "100% matched" those from Mr. Holmes's gun and Mr. Kearney's gun.  Plaintiff's arguments are, however, misplaced.  Neither of Plaintiff's arguments challenges the facts and evidence in the arresting officers' possession at the time of his arrest diminishes the existence of probable cause to support the arrest, detention, and continued detention of Plaintiff on the outstanding absconder warrant and drug charges.  As such, these arguments fail in their attack of the existence of probable cause to arrest.

### § 1983 Claims Against Detectives Druding, Falcone, Suchinsky, and Commissioner Ross

Defendants also argue that all of Plaintiff's § 1983 claims against Detectives Druding, Falcone, Suchinsky, and Commissioner Ross fail because Plaintiff has not presented any evidence to support these Defendants' personal involvement in the alleged constitutional violations.  This Court agrees.

It is well-settled that in order for an individual to be liable for a claim brought under § 1983, the individual defendant must have had some personal involvement in the wrongdoing.  *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).  As such, to maintain a viable claim, a

plaintiff "must show that [the individual defendant] participated in violating [the plaintiff's] rights, or that he directed others to violate them, or that he, as the person in charge . . . had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1990-91 (3d Cir. 1995) (citations omitted); *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (holding that the defendant "must have personal involvement in the alleged wrongs."). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207.  Any liability of an individual officer must "be based on his [or her] own acts or omissions, not those of [other] individual officers." *Agresta v. City of Philadelphia*, 801 F. Supp. 1464, 1468 (E.D. Pa. 1992).

In a civil rights action, liability also cannot be predicated on the operation of *respondeat superior* or vicarious liability.  *Rode*, 845 F.2d at 1207.  Thus, a plaintiff must show that each government official defendant, through that official's own individual actions, violated the Constitution and/or some federal right.  *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990).  A supervisor can be held liable for the acts of his or her subordinates only if he or she knows that the subordinate is violating someone's rights and fails to act to stop the subordinate from doing so. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293-94 (3d Cir. 1997), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  Acquiescence requires both contemporaneous knowledge of the alleged wrongdoing and direct supervisory authority over the subordinate actor.  *Robinson*, 120 F.3d at 1293-94.  Thus, to hold Defendants Druding, Falcone, Suchinsky, and Commissioner Ross personally liable under § 1983, Plaintiff must show that each of these individual defendants participated in the alleged violation of Plaintiff's rights, or that they individually directed others to violate Plaintiff's rights, or they

14

individually had knowledge of, and acquiesced in, their subordinates' violations. *See Baker*, 50 F.3d at 1190–91.

Here, Plaintiff has not proffered any evidence to demonstrate any personal involvement on the part of Defendants Druding, Falcone, Suchinsky, or Commissioner Ross in any of the alleged violations of Plaintiff's rights. Notably, none of these Defendants participated in Plaintiff's arrest.

Beginning with Detective Druding, record evidence shows that he assisted in the investigation of the non-fatal shooting by:

- participating in the interview and photo array procedure with Mr. Diamond, in which Mr. Diamond did not make any identification;

- preparing and serving a search warrant for incoming and outgoing texts and calls for Mr. Holmes's cell phone during the month of July 2016;

- requesting vehicle registration information for Plaintiff through the Pennsylvania Criminal Information Center; and

- preparing and serving a search warrant on Plaintiff's vehicle and collecting evidence therefrom.

None of Detective Druding's above-listed conduct constituted a violation of Plaintiff's rights. Notwithstanding, Plaintiff baldly contends that Detective Druding violated Plaintiff's rights by including a "misleading and incorrect" description of Mr. Diamond's statements in the affidavit in support of the search warrant for Plaintiff's car. (Pltf. Resp, ECF 12-2, at ¶ 48). However, Plaintiff does not explain or identify the alleged misleading and incorrect description. Furthermore, this Court compared Detective Druding's affidavit in support of the search warrant to the notes he took during Mr. Diamond's interviews and did not find any contradictions and/or misleading or incorrect descriptions therein.

Plaintiff also contends that Detective Druding failed to conduct an adequate investigation of the bullet hole found in Plaintiff's car or into the possibility that Plaintiff was a target and victim of the shooting.  Numerous courts have rejected a plaintiff's argument that his or her rights were violated by an officer's alleged incomplete or inadequate investigation.  *See*, *e.g.*, *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 790 n.8 (3d Cir. 2000) (holding the officer was not required to undertake exhaustive investigation in order to validate existence of probable cause); *Thomas v. City of Philadelphia*, 290 F. Supp.3d 371, 386 (E.D. Pa. 2018) ("[i]t certainly remains to be seen whether there is an independent cause of action under the Fourteenth Amendment . . . for 'failing to conduct a constitutionally adequate investigation,' and the *Court will not affirmatively recognize one here at this time*.") (quoting *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 332 n.3 (E.D.Pa. 2017) (emphasis in original)); *Leary v. Cook*, 2020 WL 2404892, at *15 (E.D. Pa. May 12, 2020) (holding there is no independent claim for failure to conduct an adequate investigation). In addition, a recent panel of the United States Court of Appeals for the Third Circuit noted that it has "significant doubts about whether there is an independent substantive due process right to be free from a reckless investigation." *Johnson v. Logan*, 721 F. App'x 205, 208 n.9 (3d Cir. 2018) (citations omitted).  Consistent with these decisions, this Court finds that Detective Druding's alleged inadequate investigatory conduct does not support a violation of Plaintiff's rights.  As such, Defendants' motion is granted as to all § 1983 claims asserted against Detective Druding.

As to Detective Falcone, record evidence shows that he assisted in the investigation of the non-fatal shooting by:

- processing the scene of the crime shortly after the shooting occurred;

- showing two photo arrays to Mr. Diamond;

- participating in the interview of the victim's mother and showing her a photo of Mr. Kearney;

- participating in the interview of Ms. Chase;

- conducting an interview of Mr. Diamond; and

- assisting in the preparation and service of search warrants at the residences of Mr. Holmes and Mr. Kearney, and for Mr. Holmes's car.

None of Detective Falcone's above-listed conduct constituted a violation of Plaintiff's rights. Plaintiff baldly contends that Detective Falcone "changed the facts in the affidavits of probable cause [to] contradict the statement given by Diamond . . . ."  (Pltf. Resp., ECF 12-2, at ¶ 24). However, again Plaintiff does not explain or identify the alleged contradiction.  Furthermore, this Court compared Detective Falcone's affidavit to the notes he took during Mr. Diamond's initial interview and did not find any contradictions between the two.  As such, Defendants' motion is granted as to all § 1983 claims asserted against Detective Falcone.

Regarding Detective Suchinsky, record evidence shows that he assisted in the investigation of the non-fatal shooting by conducting a double-blind interview and photo array with Ms. Afroz that resulted in Ms. Afroz's identification of Plaintiff as one of the alleged shooters.  As described above, a double-blind interview/photo array is a procedure in which an officer interviews a witness without knowing beforehand what the case is about and utilizes a photo array that the office has not seen before.  Plaintiff argues that this photo array was unduly suggestive because it included six photos of black males with beards, only one of whom was completely bald (Plaintiff).

Although a criminal defendant's due process rights are violated when evidence resulting from an unduly suggestive identification procedure is introduced at trial,[6] the existence of an unduly suggestive procedure itself does not violate any constitutional rights and cannot alone form the basis of a § 1983 claim.  *See Wray v. City of N.Y.*, 490 F.3d 189, 193 (2d Cir. 2007) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13 (1977));  *Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir. 1987) ("defendants could not have violated [the  § 1983 plaintiff's] constitutional rights simply by subjecting him to a lineup which was allegedly unduly suggestive."); *see also Anderson v. Venango County*, 458 F. App'x 161, 165 (3d Cir. 2012) (citing *Hensley* and holding that "government's violation of 'a prophylactic rule' designed to protect the right to fair trial, without violation of the right to a fair trial itself, does not support a claim under § 1983.").  As such, Plaintiff cannot defeat summary judgment by simply showing that there is a material factual dispute as to the suggestiveness of the photo array identification procedure.  Rather, Plaintiff must show that a material issue of fact exists as to whether, considering the totality of the circumstances, the unreliability of the identification due to the suggestiveness of the photo array resulted in a lack of probable cause for his arrest.  *See Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir. 2013).  As set forth above, even in the absence of the identification of Plaintiff from the challenged photo array, the arresting officers had probable cause to arrest and detain Plaintiff pursuant to the absconder warrant and the drug-related charges (one of which he eventually pled guilty to, after his acquittal on the Gun-related Charges).  Under these circumstances, Detective Suchinsky's participation in the challenged double-blind photo array cannot be shown to have led to a false arrest or false

---

[6]       This Court takes no position on whether the double-blind photo array used by Detective Suchinsky in this case was, in fact, unduly suggestive.  For purposes of this decision, however, this Court will assume that it was even though the issue was fully litigated and decided against Plaintiff in the state criminal proceedings.

imprisonment of Plaintiff, or to have otherwise violated Plaintiff's rights.  As such, Defendants'

motion is granted as to all § 1983 claims asserted against Detective Suchinsky.

Lastly, regarding Commissioner Ross, Plaintiff does not point to any evidence to show

Commissioner Ross' personal involvement in the investigation, arrest, or prosecution of Plaintiff,

or that Commissioner Ross was aware of such investigation, arrest, or prosecution.  In the absence

of any such evidence, Defendants' motion is granted as to all § 1983 claims against Commissioner

Ross.

### *§ 1983 Claims for Malicious Prosecution*

Defendants seek summary judgment on Plaintiff's § 1983 malicious prosecution claims on

the basis that Plaintiff has failed to present evidence sufficient to meet each of the required

elements of the claim.  To establish a § 1983 claim for malicious prosecution, a plaintiff must

present evidence sufficient to show that: (1) the defendant initiated a criminal proceeding against

the plaintiff; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated

without probable cause; (4) the defendant acted maliciously, or for a purpose other than bringing

the plaintiff to justice; and that (5) the plaintiff suffered a deprivation of liberty consistent with the

concept of seizure because of the legal proceedings.  *DiBella v. Borough of Beachwood*, 407 F.3d

599, 601 (3d Cir. 2005) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).  A

plaintiff's failure to satisfy any of these elements is fatal to the claim.  *Kossler v. Crisanti*, 564

F.3d 181, 186 (3d Cir. 2009).  In their motion, Defendants specifically argue that Plaintiff has

failed to meet his summary judgment burden with respect to elements one, three, and four.  This

Court finds that Plaintiff has failed to meet his summary judgment burden with respect to both the

first and third elements.

"In most circumstances, a plaintiff cannot proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual." *Harris v. City of Philadelphia,* 1998 WL 481061, at \*5 (E.D. Pa. Aug. 14, 1998) (citing *Albright v. Oliver*, 510 U.S. 266, 279 n. 5 (1994) (Ginsburg, J., concurring)); *see also Butler v. City of Philadelphia*, 2014 WL 4652276, at \*5 (E.D. Pa. Sept. 17, 2014) (citing *Harris*); *Domenech v. City of Philadelphia*, 2009 WL 1109316, at \*11 (E.D. Pa. Apr. 23, 2009), *aff'd*, 373 F. App'x 254 (3d Cir. 2010). "Where a police officer 'presents all relevant probable cause evidence to an intermediary, such as a prosecutor [or] a grand jury . . . , the intermediary's independent decision to seek a warrant . . . or return an indictment breaks the causal chain and insulates the officer from a section 1983 claim based on lack of probable cause for an arrest *or prosecution*." *Garcia v. Micewski,* 1998 WL 547246, at \*9 (E.D. Pa. Aug. 24, 1998) (quoting *Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D.W.V. 1995), *aff'd*, 91 F.3d 132 (4th Cir 1996)) (emphasis added). "However, a police officer may be held to have 'initiated' a criminal proceeding if he knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion, [because] . . . [i]n such cases, an intelligent exercise of the . . . [prosecutor's] discretion becomes impossible, and a prosecution based on the false information is deemed procured by the person giving the false information." *Harris*, 1998 WL 481061, at \*5 (internal citations omitted). In addition, "in a section 1983 malicious prosecution action . . . a grand jury indictment or presentment constitutes prima facie evidence of probable cause to prosecute [though] this prima facie evidence may be rebutted by evidence that the presentment was procured by fraud, perjury or other corrupt means." *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989); *see also Costino v. Anderson*, 786 F. App'x 344, 347 (3d Cir. 2019).

Here, pursuant to the aforementioned law, it cannot be argued that any of the Defendants, including any of the Remaining Defendants, initiated the criminal proceedings against Plaintiff. The lead detective, Detective Coulter, turned over the entire case file to the DAO.  Thereafter, it was the DAO—not any Defendants—that decided to convene a grand jury to determine whether there was probable cause to prosecute Plaintiff, and the grand jury returned an indictment against Plaintiff.  The DAO's exercise of prosecutorial discretion and the grand jury's return of an indictment against Plaintiff broke any chain of causation between Defendants' conduct and the prosecution.  Moreover, Plaintiff has not presented any evidence to suggest that Defendants provided any false information to the DAO or otherwise interfered with the DAO's prosecutorial discretion,[7] nor has Plaintiff produced any evidence that the indictment "was procured by fraud, perjury or other corrupt means."  *Rose*, 871 F.2d at 353.  To the contrary, the record reveals that the DAO was aware of all relevant information when it exercised its discretion to prosecute Plaintiff.  As such, Defendants are "insulated from a § 1983 claim for malicious prosecution." *Domenech*, 2009 WL 1109316, at *11; *see also Merrero v. Micewski*, 1998 WL 414724, at *7-8 (E.D. Pa. July 22, 1998) (finding police officer did not initiate criminal proceeding for purposes of § 1983 malicious prosecution claim because there was no evidence that any of the information he provided to prosecutors was false); *Taylor v. City of Philadelphia*, 1998 U.S. Dist. LEXIS 4295, at *26 (E.D. Pa. Apr. 2, 1998) (finding police officer who presented evidence to grand jury and prepared affidavits for arrest warrant did not initiate criminal proceeding because the record did not show that he "misrepresented or concealed material information in presenting the case to the

---

[7]     Plaintiff baldly contends that Defendants failed to disclose evidence that implicated the other two known suspects, Mr. Holmes and Mr. Kearney, as the only shooters at the underlying incident, and that this failure supports his claim for malicious prosecution.  Such a failure, however, is insufficient as a matter of law to rebut the presumption created by the indictment.  *See Milburn v. City of York*, 612 F. App'x 119, 123 (3d Cir. 2015) (citing *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 363 (3d Cir. 2003)).

prosecutors"). Accordingly, Defendants' motion for summary judgment is granted with respect to Plaintiff's § 1983 malicious prosecution claims.[8]

### State Law Claims

Having granted summary judgment on Plaintiff's federal claims in favor of Defendants, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise

---

[8]      In the alternative to their arguments addressed above, Defendants assert a defense of qualified immunity. Certain state actors, including police officers, and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity protects from suit "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant in a § 1983 action asserts a claim of qualified immunity, a court must first determine if the plaintiff's allegations are sufficient to establish the violation of a federal constitutional and/or statutory right. *Wilson*, 526 U.S. at 609; *see also Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001). "If the plaintiff's allegations meet this threshold, a court must next determine whether the right that the defendant's conduct allegedly violated was a clearly established one, about which a reasonable person would have known." *Delie*, 257 F.3d at 314–15. Thus, in determining whether an officer is entitled to qualified immunity from suit, a court must answer two questions: "(1) whether the officer violated a constitutional right," and "(2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (internal quotations and modifications omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). A right is clearly established for qualified immunity purposes if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "The doctrine aims to exclude 'the plainly incompetent' and 'those who knowingly violate the law' while accommodating reasonable 'mistaken judgments.'" *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 148 (3d Cir.2002) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). "If an official could have reasonably believed that his or her actions were lawful, the official receives immunity even if in fact the actions were not lawful." *Id.* A court may address the two inquires in either order. *Pearson*, 555 U.S. at 242. Should a court choose to address the existence of the alleged constitutional violations first, analysis of the merits (for purposes of summary judgment) merges with analysis of the deprivation of federal rights, for purposes of qualified immunity. *See Gruenke v. Seip*, 225 F.3d 290, 299–300 (3d Cir. 2000); *Russoli v. Salisbury Twp.*, 126 F. Supp. 2d 821, 838–41 (E.D. Pa. 2000).

Here, given the unchallenged evidence available to Defendants at the time of Plaintiff's initial arrest pursuant to the absconder warrant, and later regarding the drug-related charges, Defendants' conclusion that probable cause existed to arrest and continue to detain Plaintiff was reasonable. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's § 1983 claims for false arrest, false imprisonment, and malicious prosecution.

supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction"); *see also Stone v. Martin*, 720 F. App'x 132, 135 (3d Cir. 2017) (holding that district courts "'<u>must</u> decline' to exercise supplemental jurisdiction in such circumstances 'unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'") (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)) (emphasis in original); *Byrd v. Shannon*, 715 F.3d 117, 128 (3d Cir. 2013) (affirming dismissal without prejudice of pendant state claims pursuant to § 1367(c)(3) after summary judgment was granted on all federal claims).   Therefore, Plaintiff's state law claims are dismissed without prejudice.

**CONCLUSION**

For the reasons stated herein, this Court finds that Plaintiff's § 1983 claims for false arrest, false imprisonment, and malicious prosecution fail as a matter of law due to the existence of probable cause.   Accordingly, Defendants' motion for summary judgment is granted as to these claims, (Count I).  Further, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.   As such, the remaining state law claims (Counts VI through X) are dismissed without prejudice.   An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO, J*